UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

SIDARIUS DAVIS,

                                 Plaintiff,

          -against-

THE CITY OF NEW YORK, NYPD CHIEF OF PATROL
JOHN CHELL, DEPUTY COMMISSIONER OF
OPERATIONS KAZ DAUGHTRY, NYPD POLICE
OFFICER WILLIAM SCHUMACHER (Badge 4618),
NYPD DETECTIVE SPECIALIST ALEX S. MILLS
(Badge 3188), NYPD DETECTIVE TEANESHA
JACKSON (Badge No. 4342), and NYPD LIEUTENANT
NIKOLAUS STEFOPOULOS,

                              Defendants.

-----------------------------------------------------------------------X

**VERIFIED
COMPLAINT**

Index No.:

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff, SIDARIUS DAVIS, by his attorney, KAISHIAN & MORTAZAVI LLC, by MARYANNE

K. KAISHIAN, ESQ., an attorney duly admitted to practice before the Court of the Eastern District

of New York, hereby complains of Defendants as follows:

## PRELIMINARY STATEMENT

     1.     On September 4, 2023, at approximately 6:10 PM, Plaintiff Sidarius Davis was

lawfully present on a public sidewalk in Kings County during the annual J'Ouvert celebration.

Without warning, cause, or justification, two (2) members of the NYPD's Community Response

Team (CRT), a specialized unit within the Department, suddenly assaulted Plaintiff without

warning, cause or justification.

     2.     Defendant NYPD Police Officer William Schumacher tackled Mr. Davis into a hot

metal grill that was actively in use, causing severe burns and scarring to Mr. Davis' body, and threw

Mr. Davis to the ground. Defendant Schumacher and his partner then continued to assault and batter

Mr. Davis on the concrete sidewalk, striking his head against the ground repeatedly and causing

Plaintiff additional serious injuries. Following this assault, Defendants searched Mr. Davis' person

and property without lawful authority. Defendants left the badly injured Mr. Davis on the sidewalk without arresting him.

3.     Defendants' conduct violated Mr. Davis' constitutional and civil rights. Defendants were further acting in accordance with Defendant City's harmful policies and practices concerning the NYPD's Community Response Team, a unit whose members are personally selected Defendants Chief of Department John Chell and closely overseen by Defendant City's policymakers and officials, including Defendant Kaz Daughtry. Members of NYPD's CRT are afforded exceptions to basic rules intended to protect the rights and safety of individuals such as Plaintiff, and whose members boast disproportionately high rates of substantiated misconduct and excessive force complaints relative to non-CRT NYPD members.

4.     As a result of Defendants' conduct, Plaintiff was seriously injured. Plaintiff now bring the instant Complaint before this Court.

## PARTIES

5.     **PLAINTIFF SIDARIUS DAVIS ("Plaintiff" or "Mr. Davis")** is, and was at all relevant times, an adult resident of BRONX COUNTY in the City and State of New York.

6.     **DEFENDANT CITY OF NEW YORK ("Defendant City")** was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD") and their employees. Under New York State law, Defendant City is liable for the actions of its NYPD agents and/or employees under the doctrine of *respondeat superior*.

7.     **DEFENDANT CHIEF OF PATROL JOHN CHELL ("Defendant Chell")**, at all relevant times, was the Chief of Patrol for Defendant City's NYPD. As NYPD Chief of Patrol, at

2

all relevant times, Defendant John Chell was responsible for the selection, training, hiring, discipline, supervision, and assignment of all Community Response Team (CRT) members within the NYPD. At all relevant times, Defendant Chell had policymaking authority over the Department. At all relevant times, as NYPD Chief of Patrol, Defendant Chell had primary responsibility for NYPD patrol operations, including for creating, implementing, and enforcing policies and procedures for NYPD street stops. NYPD uniformed members of the service were obligated to obey any lawful order given by Defendant Chell. Defendant Chell is sued individually and as an agent and/or employee of Defendant City. Defendant Chell further constitutes a policymaker for whom Defendant City is liable.

8. **DEFENDANT DEPUTY COMMISSIONER OF OPERATIONS KAZ DAUGHTRY ("Defendant Daughtry")**, at all relevant times, was the Assistant Commissioner to the NYPD Police Commissioner. As Assistant Commissioner, Defendant Daughtry was responsible for serving as the NYPD's City Hall Liaison and as Chief of Staff to the Chief of Department. In this position, Defendant Daughtry was responsible for creating and implementing NYPD technology policy, including body worn camera usage, and for participating in the creation and implementation of other NYPD procedures. In this role, Defendant Daughtry, with Defendant Chell, was directly responsible for the implementation of NYPD CRT's body worn camera policies and practices. Defendant Daughtry is sued individually and as an agent and/or employee of Defendant City. Defendant Daughtry further constitutes a policymaker for whom Defendant City is liable.

9. NYPD Community Response Team members have no assigned precinct. Instead, while within the paramilitary structure of the NYPD, CRT operates independently from typical NYPD precinct or Police Service Area assignments and their hierarchy of authority. CRT members bypass intermediary supervisors such as precinct commanders and report directly to Defendant

City's policymakers and high-ranking NYPD officials. Specifically, CRT members are supervised directly by **DEFENDANT CHIEF OF PATROL JOHN CHELL**, and report directly to Defendant Chell, in addition to ranking NYPD CRT member(s) at the scene of an arrest. Each member of the CRT—including **DEFENDANT NYPD POLICE OFFICER WILLIAM SCHUMACHER**—is individually selected by Defendants Chell and/or high-ranking officials and policymakers with Defendant City.

10. **DEFENDANT WILLIAM SCHUMACHER ("Defendant Schumacher")**, at all relevant times, was a police officer employed by Defendant City through its police department, the NYPD. At the time of the incidents complained of herein, Defendant Schumacher was assigned to an NYPD Community Response Team (CRT). At all relevant times, Defendant Schumacher was acting within the scope of his employment and in his capacity as an agent and/or employee of Defendant City.

11. **DEFENDANT DETECTIVE SPECIALIST ALEX S. MILLS (BADGE No. 3188)**, at all relevant times, was either a police officer or a detective employed by Defendant City through its police department, the NYPD. At the time of the incident, though NYPD records indicate Defendant Mills officially commanded the rank of NYPD Detective, Defendant Mills wore an NYPD uniform identifying himself as "PO Mills," and bearing badge number 9578, a badge number not associated with any active NYPD member according to NYPD personnel records. At the time of the incidents complained of herein, Defendant Mills was assigned to an NYPD Community Response Team (CRT) and was specifically assigned as a representative from Defendant Chell's Chief of Patrol Office. At all relevant times, Defendant Schumacher was acting within the scope of his employment and in his capacity as an agent and/or employee of Defendant City.

12.      **DEFENDANT LIEUTENANT NIKOLAOS STEFOPOULOS ("Defendant Stefopoulos")**, at all relevant times, was a lieutenant employed by Defendant City through its police department, the NYPD, and assigned to the NYPD's CRT. As Lieutenant with the NYPD CRT, Defendant Stefopoulos was responsible for supervising the CRT police officers conducting field arrests under his command. Defendant Stefopoulos was further responsible for reporting directly to Defendants Chell and Daughtry. At all relevant times, Defendant Stefopoulos was acting within the scope of his employment and in his capacity as an agent and/or employee of Defendant City.

13.      At all times hereinafter mentioned, all individual Defendants were acting under color of state law and/or were acting in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of Defendant City of New York as agents and/or employees of Defendant City's NYPD.

14.      Each and every act and omission by the individual Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

15.      The individual Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

16.      All Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

17.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

18.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

20.     Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.*, in the Eastern District of New York, where Defendant City resides and where a majority of the actions complained of herein occurred.

21.     Plaintiff filed a Notice of Claim within ninety (90) days of the incident giving rise to this Complaint in accordance with GML § 50-E.

22.     Defendant City examined Plaintiff pursuant to GML § 50-H on March 6, 2024.

23.     The damages amount sought by Plaintiff exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

24.     More than thirty (30) days have elapsed since Plaintiff's claims were submitted for payment to Defendant City and payment has been neglected or refused.

25.     The instant Complaint is timely filed within one year and ninety (90) days of the incident giving rise to the injuries complained of herein.

**STATEMENT OF FACTS**

26.     The events giving rise to Plaintiff's injuries arose on September 4, 2023, at approximately 6:10 PM, on a public sidewalk on Utica Avenue near the intersection of St. John's Place in Kings County, City and State of New York.

27.     At the above approximate time and place, Mr. Davis was lawfully present on a public sidewalk.

28.     Mr. Davis had committed no crimes.

29.     Defendants possessed no warrant for Mr. Davis and had cause to arrest or detain him.

30.     Mr. Davis was unarmed.

31.     Nevertheless, at the above approximate time and place, with no warning and without issuing any lawful orders, DEFENDANT NYPD POLICE OFFICER WILLIAM SCHUMACHER, assigned to NYPD CRT, suddenly approached and tackled Mr. Davis without cause.

32.     Defendant Schumacher tackled Plaintiff using the full weight of Defendant's body and landing on top of Mr. Davis.

33.     Prior to Defendant Schumacher's assault, Mr. Davis was standing near an open barrel-shaped grill upon which another individual was preparing food.

34.     The grill was actively and visibly functional, as it was being operated by the individual preparing food and was producing smoke, and its metal barrel was hot to the touch.

35.     Defendant Schumacher tackled Mr. Davis into this hot grill, causing Mr. Davis to fall backwards into the searing hot metal barrel.

36.     Defendant Schumacher caused Mr. Davis suffered severe burns to his back, both shoulders, and the back of both arms.

37.     After forcing Mr. Davis to strike the grill, Defendant continued to tackle Mr. Davis to the concrete sidewalk, landing with Defendant Schumacher's body weight on top of Mr. Davis.

38.     Defendant Schumacher then placed his knee on Mr. Davis' chest and used both of Defendants' hands to shove Mr. Davis' face and head into the concrete sidewalk, causing pain, bruising, swelling, and lacerations to Mr. Davis' face, head, and body, and causing Mr. Davis to have difficulty breathing and to fear for his life.

39.     At no time did Defendant Schumacher issue lawful orders to Mr. Davis.

40.     At no time did Mr. Davis resist or refuse to obey any orders issued by Defendant.

41.     Defendant Schumacher was then joined in assaulting and battering Mr. Davis by DEFENDANT NYPD DETECTIVE TEANESHA JACKSON, who was also assigned to NYPD CRT, and wore an NYPD-issued vest identifying Defendant Jackson as a member of CRT.

42.     The NYPD Officer Profile, the database maintained by the NYPD and containing employment information for NYPD personnel, does not reflect any CRT assignment in Defendant Jackson's employment history.

43.     Defendant Jackson placed her body weight on Mr. Davis' back and chest, and assisted Defendant Schumacher in twisting Mr. Davis' arms behind his back, causing further pain, bruising, swelling, and other injuries to Mr. Davis' back, chest, and shoulders, and further exacerbating Mr. Davis' injuries.

44.     Another CRT member, believed to be DEFENDANT NYPD DETECTIVE ALEX MILLS (BADGE NO. 3188), further assisted Defendants Schumacher and Mills by placing additional weight on these Defendants, who had pinned Plaintiff to the ground, causing Plaintiff additional pain and difficulty breathing.

45.     Despite Defendant Mills' position and badge number as reflected in NYPD personnel records, Defendant Mills was wearing an NYPD uniform shirt that read "NYPD CHIEF OF PATROL'S OFFICE," apparently misidentifying this Defendant as "PO Mills," and bearing badge number 9578.

46.     The NYPD Officer Profile, the database maintained by the NYPD and containing employment information for NYPD personnel, does not reflect any individual assigned badge number 9578.

47.     Defendants Schumacher and Mills then, together, yanked Mr. Davis to a standing position by hoisting him at an unnatural angle by his arms and elbows, further exacerbating the injuries to Mr. Davis' shoulders.

48.     Defendant Schumacher proceeded to search Mr. Davis' person and property, including a closed bag, without cause or justification.

49.     Mr. Davis did not possess any unlawful items.

50.     Mr. Davis had not committed, and was not charged with committing, any crime.

51.     Present and supervising Defendant Schumacher, Mills, and Jackosn's conduct was DEFENDANT NYPD LIEUTENANT NIKOLAOS STEFOPOULOS.

52.     Defendant NYPD Sergeant Stefopoulos did not intervene in, correct, or mitigate his supervisees' conduct.

53.     Consistent with CRT policies and practices, detailed further below, Defendants Schumacher, Mills, and Jackson were not wearing body-worn cameras, or, in the alternative, were not wearing body worn cameras that produced discoverable footage through standard NYPD and legal channels.

54.     Immediately following Defendant Schumacher's violent takedown of Plaintiff, additional NYPD members, assigned to nearby NYPD patrol posts arrived at the scene.

55.     At no time did any Defendants, or any other NYPD members, intervene in the wrongful conduct of their colleagues.

56.     Mr. Davis required immediate medical attention.

57.     Mr. Davis requested immediate medical attention, as did bystanders who witnessed this public assault and observed Mr. Davis' serious injuries.

58.     Defendants Schumacher, Mills, Jackson, Stefopoulos, and responding NYPD members, denied and/or delayed Plaintiff's care by preventing Plaintiff from accessing a nearby ambulance and by preventing emergency medical staff from providing Plaintiff with care.

59.     Defendants denied and/or delayed Plaintiff's care, thus exacerbating his injuries, forcing him to expend additional costs, and forcing him to seek treatment by transporting himself to a nearby hospital while suffering from severe burns and a head injury, in addition to further injuries caused by Defendants.

## **DAMAGES**

60.     Defendants' conduct caused serious physical, emotional, and financial injuries to Plaintiff.

61.     Defendants caused Plaintiff significant pain and suffering, caused Plaintiff to suffer difficulty breathing and chest pain, and placed Plaintiff in fear for his life.

62.     Defendants forced Plaintiff to seek medical care.

63.     As described above, Plaintiff sustained injuries to his physical and emotional well-being, including a permanent scarring, pain and suffering, muscle and tissue damage, reduced range

of motion in both shoulders, and reduced ability to participate in regular activities, and reduced enjoyment of daily life.

64.     Defendants caused Plaintiff to suffer financial damage, including lost wages and expenses.

65.     The conduct of Defendants caused Plaintiff serious emotional injury including distress, anxiety, fear of death, difficulty sleeping, post-traumatic stress, mental anguish, in addition to other emotional trauma/damage.

66.     The effects of Plaintiff's injuries are ongoing.

67.     Plaintiff continues to suffer from the injuries caused by Defendants, and the full extent of their injuries is not yet known.

68.     Plaintiff alleges the following damages, among others: compensatory damages for past and/or future emotional and/or physical pain and suffering; compensatory damages for violation(s) of Plaintiff's constitutional rights; compensatory damages for loss of past and/or future income; compensatory damages for past and/or future medical expenses; compensatory damages for other economic damages; diverse general and special damages; and punitive damages.

### FIRST CLAIM FOR RELIEF

**Excessive Force**
***Against Defendants Schumacher, Jackson, and Mills Pursuant to 42 U.S.C. § 1983***

69.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

70.     Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

71. Plaintiff had committed no crime, had no warrant for his arrest or search, did not fail to obey any lawful order, and was lawfully present on a public sidewalk at the time he was accosted and assaulted by Defendants.

72. These instances of excessive force include, *inter alia*, Defendant Schumacher tackling Plaintiff into a hot metal grill, Defendant Schumacher tackling Plaintiff to the concrete sidewalk, Defendant Schumacher shoving and/or slamming Plaintiff's head into the concrete sidewalk, Defendants Schumacher, Jackson, and Mills individually and together placing their body weight on Plaintiff and restricting his breathing, and Defendants twisting, shoving, and striking Plaintiff's body.

73. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

74. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Failure to Intervene

***Against Defendants Jackson, Mills,, and Stefopoulos Pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution***

75. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

76. At no time did any Defendant NYPD members, or any other NYPD members, intervene in the unlawful conduct of their colleagues, including the multiple instances of excessive force against Plaintiff described above.

77.     Defendant NYPD Members possessed a special duty to Plaintiff and possessed sufficient knowledge that inaction would lead to the harms suffered by Plaintiff.

78.     Defendants witnessed and/or knew of the harmful conduct of fellow Defendants and merely observed and/or unreasonably ignored such conduct against Plaintiff.

79.     At no time did any Defendants intervene in the deficient conduct of their colleagues or otherwise fulfil their specialized duty to protect Plaintiff.

80.     Defendant City and its employees and/or agents breached the existing duty to protect Plaintiff, and such inaction enabled and/or facilitated and/or exacerbated the harms caused by Defendants' conduct and suffered by Plaintiff.

81.     The above Defendants, acting under color of law, failed to protect Plaintiff, and such inaction enabled and/or facilitated and/or exacerbated the injuries suffered by Plaintiff.

## THIRD CLAIM FOR RELIEF

**Municipal Liability**
*As Against Defendant City Pursuant to Monell v Social Svcs (436 U.S. 658 (1978) and 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments*

82.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

83.     The Policymaker Defendants were responsible for implementing and enforcing policies and procedures on behalf of the Defendant City of New York.

84.     The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff to, including, *inter alia*, Defendant City's policies of unlawful searches and seizures and excessive uses of force by members of NYPD CRT.

85. All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed NYPD member defendants pursuant to the above-described policies, practices, and customs.

86. All acts were carried out in accordance with:

    a. Formal policies, rules, and procedures of Defendant City;

    b. Actions and decisions by Defendant City's policymaking agents including, but not limited to, Mayor Eric Adams, Chief of Patrol John Chell, and Deputy Commissioner Kaz Daughtry;

    c. Customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City by its agents;

    d. Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

87. These policies and customs include:

I.    <u>Excluding CRT Members from "Uniformed Members of Service" Requirements</u>

88. The NYPD's Patrol Guide mandates the use of body-worn cameras for all "uniformed members of service," with specific and narrow exceptions.

89. No such exceptions were applicable to the instant matter, nor are these exceptions broadly applicable to the routine type of street-level encounters in which CRT members typically engage.

90.     "Uniformed members of service" of the NYPD are defined by and for Defendant City and the NYPD as *all* non-civilian NYPD employees holding the rank of Captain or below. Accordingly, NYPD employees are classified as belonging to one of just two categories: 1) Uniformed Members of Service or 2) Civilian Members of Service.

91.     The "uniformed" designation is, in many instances, a misnomer, as the common understanding and use of the word "uniformed" is nonoperative for NYPD employee designation purposes.

92.     However, Defendant City and its policymakers and NYPD officials responsible for creating, implementing, and enforcing NYPD policies and practices have routinely and intentionally misapplied the definition of "uniformed members of service" to exclude NYPD members who do not wear standard NYPD patrol uniforms.

93.     This misapplication is particularly relevant to CRT members, who, as here, are frequently not outfitted with standard body-worn cameras or visible identification.

94.     NYPD Community Response Team members consistently wear khaki pants rather than blue pants that are part of the standard NYPD uniform.

95.     Indeed, Defendants Schumacher, Jackson, and Mills, all of whom were wearing khaki pants paired with non-standard NYPD gear, were not outfitted with body worn cameras capable of producing footage that could be viewed and/or shared in accordance with standard body worn camera requirements.

96.     Consistent with NYPD CRT policies and practices, Defendant Schumacher was not wearing a name patch or badge for identification purposes at the time they caused Plaintiff's injuries. Defendant Mills' NYPD-issued gear misidentified him. Defendant Jackson's employment history does not reflect any assignment to CRT.

97. CRT members' violation of relevant standards are directly and expressly approved by Defendant City, through its policymakers including Defendant Chell, who either expressly or tacitly exempt such individuals from certain "uniformed member of service" requirements, including regarding NYPD uniform, self-identification, and body-worn camera activation rules.

98. CRT members' violations are further tacitly approved by Defendant City, through its policymaker Defendants and NYPD official Defendants with disciplinary and/or hiring power such as Mayor Eric Adams and Defendant Chell, who assign, promote, and decline to discipline and/or fire individual NYPD members who have demonstrably violated these and other rules governing NYPD member conduct.

99. This failure is consistent with recent reporting to the Southern District of New York submitted by the Federal Monitor over the NYPD.

100. The Federal Monitor responsible for investigating and reporting NYPD compliance with court directives and constitutional requirements in the Southern District of New York under *Floyd, et al. v. City of New York*, 08-CV-1034 (AT), *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT), and *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT) released an interim report on February 22, 2024. *Floyd*, Dkt. 923.

101. Plaintiff incorporates all cited matters above by reference.

102. The Federal Monitor reported its findings regarding the NYPD's lack of compliance with conduct and reporting requirements related to street encounters to be "quite unsettling," and determined "that the NYPD is not in compliance with the Court-ordered reforms in these cases." *Id*.

103. The information presented to the Court included data showing "unconstitutional reported stops increasing from 10.6% in 2021 to 11.3% in 2022." *Id*. The Federal Monitor further

reported: "Unconstitutional frisks rose from 15.8% in 2021 to 23.9% in 2022. Unlawful searches rose from 20.4% in 2021 to 29.9% in unlawful searches." *Id*.

104.    As the Federal Monitor emphasized, "These increases are substantial." *Id*.

105.    Data from the NYPD's Community Response Team reflects higher rates of such stops and related abuses, although lack of transparency has frustrated attempts at accountability and compliance.

106.    These policies and practices created and adopted by Defendant City, by its policymakers, in addition to those policies described elsewhere herein, combine and exacerbate one another to create the preventable conditions that foreseeably caused to Plaintiff's injuries.

## II.    Selecting NYPD Members with Significant Misconduct Histories for CRT Posts

107.    The individual Defendants in this matter, including and particularly Defendant Schumacher, have a lengthy record of misconduct, including excessive force, resulting in substantiated complaints, settlements, and litigation.

108.    In 2024, Defendant Schumacher was identified as the seventh (7th) NYPD member most frequently sued for violating individuals' civil rights in police department with approximately 36,000 employees.[1]

109.    Defendant Schumacher also has fifteen (15) substantiated Civilian Complaint Review Board allegations, all of which occurred prior to his assault of Plaintiff. Defendant Stefopoulos, then a supervisor in the unit, has seventeen (17) such thoroughly investigated and substantiated allegations.

110.    An NYPD member with an extensive misconduct history is not an aberration in CRT.

---

[1] *See* Matt Troutman, *These NYPD Cops Cost Taxpayers $65M, Named In Most Civil Cases: Study*, THE PATCH, Mar 19, 2024, *available at https://patch.com/new-york/new-york-city/these-nypd-cops-cost-taxpayers-65m-named-most-civil-cases-study*.

111.     Indeed, these "handpicked" individuals are routinely selected for CRT assignments by Defendant City, through its policymakers and NYPD officials such as Defendant Chell, *after* they have established a clear history of violating the rights of New Yorkers.

112.     CRT members engage in misconduct, including excessive force, at demonstrably higher rates than other NYPD police officers.

III.     <u>Rewarding and/or Encouraging Abusive Conduct by CRT Members</u>

113.     In addition to demonstrating patterns of misconduct prior to selection for a place within NYPD's CRT, CRT members continue to demonstrate high rates of misconduct during civilian encounters while on CRT assignment.

114.     Defendant City has failed to discipline NYPD members with substantiated histories of misconduct. Indeed, these individuals are routinely

115.     The NYPD's CRT is the latest iteration of a policing unit that historically tasked by Defendant City with employing aggressive, sometimes referred to as "proactive,"[2] tactics during street stops of civilians, and which has historically accounted for disproportionate rates of violence and uses of deadly force.

116.     In 2022, Defendant Mayor Eric Adams, a policymaker for whom Defendant City is liable, through his policymaking authority and as the chief executive of Defendant City and its NYPD, reinstated this unit, rebranded as the NYPD Community Response Team.

117.     Defendant City, by its policymakers, was aware that the reinstatement of this unit posed a significant threat to the safety of individuals such as Plaintiff.

118.     By effectively reinstating this unit under the Community Response Team banner, and by further intentionally assigning NYPD members with significant misconduct histories to this

same unit, Defendant City, through its policymakers, including Mayor Eric Adams and Defendant Chell, knowingly and willfully exposed individuals such as Plaintiff to heightened risk of baseless stops, seizures, searches, and violence at the hands of NYPD members.

119. By reinstating this unit, Defendant City expressly and/or tacitly encouraged the conduct demonstrated by NYPD members assigned to its previous iterations, including the Anti-Crime Unit.

IV. <u>Engaging in Deceptive and Secretive Practices to Shield CRT Members from Identification and Transparency</u>

120. Defendant City, by its policymakers, intentionally shields information regarding Community Response Teams and their members from public access.

121. In this instance, at least two individual NYPD members, Defendants Mills and Jackson, each assigned to CRT, wore misidentifying information and/or were not identified in NYPD's public personnel data as ever having been assigned to Community Response Teams.

122. This secrecy, deception, and lack of available information is consistent with Defendant City's policies governing NYPD's CRT.

123. Defendant City's policy of not requiring body worn camera usage by CRT members, or, at minimum, declining to require CRT members to comply with body worn camera usage that permits accessing footage through standard NYPD and legal channels, further inhibits transparency and contributes to reduced safety for individuals during police encounters and increased utilizations of excessive force.

124. On November 26, 2024, the NYC Department of Investigation issued an interim report and series of recommendations pursuant to an ongoing investigation into NYPD's CRT.

125. The interim report found "insufficient public information about NYPD's community response team and an absence of written policies and procedures to guide its actions."

126.    DOI Commissioner Jocelyn E. Strauber said, "NYPD's Community Response Team ("CRT") has been operating for over two years, and publicly available information about CRT and its enforcement activities is quite limited. This Report provides some transparency around CRT's formation, staffing and structure; exposes significant gaps in CRT policies and procedures; and raises important questions about how its effectiveness is measured. DOI's OIG-NYPD will continue to evaluate CRT's enforcement activities and the impact of its work in the next phase of our investigation."

127.    OIG-NYPD Inspector General Jeanene L. Barrett said, "The lack of transparency regarding NYPD's Community Response Team ("CRT") risks non-compliance with the law, ethical breaches, and negative policing outcomes. Since its inception more than two years ago, CRT has expanded significantly, with a team in every Patrol Borough, without a corresponding expansion of publicly available information about the work of this unit."

128.    The report further identified that an "absence of clearly stated policies and procedures applicable to CRT specifically is a significant flaw in NYPD's approach to CRT. It is well-established that specialized units with unique and distinct missions benefit from clear rules that are known to both officers and supervisors. Without such rules there is a risk of officer misconduct, violations of law, and other failures that could compromise unit operations. An absence of clear rules limits NYPD's ability to effectively oversee CRT and to ensure its officers are accountable and increases their exposure to potential liability."

129.   This report was issued in the wake of additional OIG and Federal Monitor reports determining that CRT was in violation of reporting requirements, including regarding its body worn cameras and additional technology pursuant to the POST Act. [3]

130.   Defendant City, through applicable policies and procedures, has fostered a culture that combines lack of transparency with incentivized violence and/or misconduct with full knowledge of the dangers posed by these policies and their certainty to cause direct harm to individuals such as Plaintiff.

131.   Defendant City accepted, encouraged, condoned, ratified, sanctioned, and/or enforced these policies, whether expressly or tacitly, and created the conditions giving rise to Plaintiff's serious injuries.

132.   Defendant City is liable to Plaintiff for his injuries.

## FOURTH CLAIM FOR RELIEF

### Negligence
### *Against All Defendants Pursuant to New York State Law*

133.   Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

134.   Defendants possessed a special duty to Plaintiff and breached that duty through their respective and collective conduct.

135.   As a result of the Defendants' conduct, Plaintiff sustained the injuries complained of herein.

136.   Said negligence stated herein, consisted, *inter alia*, of negligence in hiring, training, retention of police officers involved in this incident; supervision; negligence in failing to adhere to

---

[3] Press Release by the New York City Office of the Inspector General, November 26, 2024, *available at https://www.nyc.gov/assets/doi/reports/pdf/2024/45CRT.Rpt.Release11.26.2024.pdf.*

the existing police department Police Patrol Guidelines protocol as to the use of force causing serious injuries both physical and emotional; deprivation of Plaintiff's civil rights, privilege and immunities secured under the Constitution of the United States of America and State of New York; and negligence in failing to use care in performance of police duties for which a reasonably prudent and careful police officer would have used in similar circumstances.

137.    Due to the aforementioned negligence by Defendants, Plaintiff were caused to suffer severe physical injuries, pain and suffering, and emotional and psychological distress and anguish.

138.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

**Wrongful Search and Seizure and/or Excessive Force**
***Against All Defendants Pursuant to New York City Admin. Code,***
***Ch. 8, Title 8, § 8-801, et seq.***

139.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

140.    As described above, the Defendants violated Plaintiff's right to be free from "unreasonable searches and seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a search or seizure."

141.    Pursuant to NYC Admin. Code Title 8, Chapter 8, §§ 8-801 through 8-809 of the New York City Civil Rights Law, Plaintiff maintains a private right of action against the individual NYPD Defendants and their employer, Defendant City, for this conduct.

142.    The NYPD Defendants, including Defendant Campuzano and Defendant NYPD Does # 1-5, as employees of the Defendant City's police department, are "covered individuals" as defined in § 8-801 of this Chapter.

143. Pursuant to § 8-802, *et seq.*, NYPD Defendants and their employer, including Defendant City, are liable to Plaintiff for the conduct described herein.

144. Pursuant to § 8-803, Plaintiff's claims under common law or pursuant to any other law or rule are not limited or abrogated by his invocation of this statute.

145. The remedies provided by this chapter are in addition to any other remedies that may be provided for under common law or pursuant to any other law or rule.

146. Pursuant to § 8-804, Defendants may not invoke the defense of qualified immunity to avoid liability for this cause of action.

147. Pursuant to § 8-806, Plaintiff are entitled to compensatory and punitive damages, attorney's fees and costs, and an order restraining the Defendants from engaging in further violative conduct.

## SIXTH CLAIM FOR RELIEF

### Assault and Battery
### *Against Defendants Schumacher, Jackson, and Mills Pursuant to New York State Law*

148. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

149. Defendant Schumacher committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

150. The force utilized by Defendant was unreasonable and intentional.

151. Defendant committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

152. Defendant did thereby inflict assault and battery upon the Plaintiff.

153. Plaintiff was seriously injured as a result of this conduct.

154. The unlawful conduct of the Defendant was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against Defendant.

## SEVENTH CLAIM FOR RELIEF

### Negligent Training, Hiring, and Retention
*Against Defendant City Pursuant to New York State Law*

155. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

156. Upon information and belief, Defendant City, by its agents and/or employees, supervised and trained the police officials described above and did so in a negligent manner resulting in the harms described.

157. At all times relevant herein, NYPD Defendants were employed by, and acting in the scope of their employment with, Defendant City.

158. Defendant City should have known that Defendant NYPD Members had a propensity for the conduct causing Plaintiff's injuries.

159. Defendant City negligently entrusted Defendants, including Defendant Schumacher, with the power and authority to cause Plaintiff's harms, including with his service weapon while off duty.

## EIGHTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress
*Against All Defendants Pursuant to New York State Law*

160. Defendants owed Plaintiff a duty of care and breached this duty of care through the conduct described herein, directly causing the emotional harms, including post-traumatic stress, insomnia, depression, and ongoing anxiety and fear to both Plaintiff.

## NINTH CLAIM FOR RELIEF

**Violations of the New York State Constitution**
*Against All Defendants*

161.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I §§ 11 (equal protection) and 12 (security against unreasonable searches and seizures) of the New York State Constitution.

162.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 11 and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demand a jury trial of all issues capable of being determined by a jury.

## CONCLUSION AND DEMAND FOR JUDGMENT

**WHEREFORE**, Plaintiff demand judgment against the individual Defendants and the City of New York as follows:

i.      Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.     Actual damages in an amount to be determined at trial against Defendant City;

ii.     Injunctive relief and policy change;

iii.    All relief available to Plaintiff pursuant to New York State Civil Rights law;

iv.     All relief available to Plaintiff pursuant to NY Admin. Code, including Ch. 8, Title 8, § 8-801, *et. seq*;

v.      Statutory attorney's fees, disbursements, punitive damages, actual damages, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988; and

vi.     Such other relief as the Court deems just and proper.


**Dated:**     Brooklyn, New York
            December 3, 2024

                        **KAISHIAN & MORTAZAVI LLC**
                        **Attorneys for Plaintiff**

                        By: _____
                        Maryanne K. Kaishian, Esq.
                        55 Washington Street, Ste. 508
                        Brooklyn, New York 11201
                        T: (347) 662-2421
                        E: mk@kaishianlaw.com

## ATTORNEY VERIFICATION

I, MARYANNE K. KAISHIAN, an attorney duly admitted to practice duly admitted to practice before the United States District Court for the Eastern District of New York, affirms the following to be true under the penalties of perjury:

1. I am the attorney of record for the Plaintiff.

2. I submit the instant verification on behalf of Plaintiff SIDARIUS DAVIS.

3. I have read the annexed Complaint and know the contents thereof, and the same are true to my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters, I believe them to be true.

4. My beliefs, as to those matters therein not stated upon knowledge, are based upon facts, records, and other pertinent information contained in my files.

5. I make this verification because Plaintiff SIDARIUS DAVIS does not currently reside in the County (Kings) where I maintain my office.

**DATED:**     Brooklyn, New York
December 3, 2024

By: _____
Maryanne K. Kaishian, Esq.
**Kaishian & Mortazavi LLC**